[No. C012349. Third Dist. Aug. 11, 1994.]

In re the Marriage of CLAUDIA and RICHARD NICHOLS.
CLAUDIA NICHOLS, Appellant, v.
RICHARD NICHOLS, Appellant.

662

**COUNSEL**

Guthrie & McCaleb, Jerry L. Guthrie and Elizabeth E. Harrison for Appellant Claudia Nichols.

Jay-Allen Eisen, Marian M. Johnston, Ann Perrin Farina and Karen Pedersen Stevens for Appellant Richard Nichols.

**OPINION**

**SCOTLAND, J.**—These appeals from the judgment of dissolution of the 22-year marriage of Claudia Nichols (wife) and Richard Nichols (husband)

and from a postjudgment order awarding attorney fees and costs center on a dispute over the value of a community asset, husband's shareholder interest in his law firm.

Wife's expert valued the interest by determining the book value of the law firm's net assets—its fixed assets such as furniture *plus its accounts receivable and work in progress*, minus its liabilities—and multiplying that figure by husband's percentage interest in the firm. Using this method, wife's expert concluded the interest was worth $142,000.

Husband's expert valued the interest in accordance with a stock purchase agreement which husband signed when he became a shareholder. The agreement provides that shareholders joining the firm shall pay, and those leaving the firm shall be paid, for their interest in the firm's net assets *with the exception of accounts receivable, goodwill and work in progress*. According to this expert, the stock purchase agreement fairly represents husband's interest in the firm for the following reasons: In becoming a shareholder, husband did not pay for any portion of the firm's accounts receivable or work in progress. The firm has followed the shareholder agreement for many years and has no plans to modify it. With only a minority shareholder interest, husband has no ability to change the agreement unilaterally. Husband's earnings are not based upon his proportional shareholder interest; rather, his compensation is based upon an employment contract which provides for remuneration based upon productivity and longevity with the firm. Hence, the only way husband, as a shareholder, potentially can benefit from the firm's accounts receivable and work in progress is if the firm liquidates, a prospect that is not probable and would likely yield a minimal return, if any, to each shareholder due to the firm's long-term debts. Applying the agreement's formulation, the expert valued the interest at $11,347.

Except for the agreement's exclusion of goodwill, the trial court held "that the stock purchase agreement should control" in valuing husband's shareholder interest in the law firm. Accepting the testimony of husband's expert, the court found the interest was worth $11,347.[1]

Wife contends the trial court incorrectly valued husband's shareholder interest in his law firm without considering its accounts receivable and work in progress. Husband cross-appeals "to preserve the issue of attorney fees and spousal support should this court remand the case for redetermination of the value of the community's interest in [his] professional practice." He asserts that, "[i]f a higher value is placed on [his interest in his law] practice

---

[1]The trial court found that husband had professional goodwill, and the parties stipulated that $35,000 is the value of the community interest therein.

than originally found by the trial court, [wife's] need for spousal support and her entitlement to attorney fees will have to be adjusted accordingly."

Our review of the record discloses the trial court did not abuse its discretion in valuing husband's shareholder interest in his law firm based upon the stock purchase agreement which excludes accounts receivable and work in progress. Therefore, we shall affirm the judgment.

FACTS

The parties married in August 1963 and separated in June 1986. Husband is an attorney and a shareholder in the Sacramento law firm of McDonough, Holland & Allen (McDonough); he joined the firm as a shareholder in 1978. Wife was not employed outside the home during the marriage.

After wife filed a petition for dissolution of their marriage, the parties stipulated to the division and valuation of most of their community property, and agreed that all assets would be valued as of the trial date of December 31, 1990, with the exception of husband's professional goodwill, if any, which would be valued as of the date of separation. They further stipulated that, if husband were found to have goodwill, its community value would be $35,000.

The only issues reserved for trial were (1) the value of husband's shareholder interest in his law firm, (2) whether he had goodwill, (3) the amount of permanent spousal support to be paid to wife, and (4) wife's entitlement to an award of attorney fees and costs.

Upon becoming a shareholder of McDonough, each attorney signs a stock purchase and sale agreement. Pursuant to this agreement, the price of the attorney's stock is determined by a formula which is based on the book value of all the firm's assets except its accounts receivable, goodwill, and work in progress.[2] When a shareholder dies, becomes disabled or otherwise unable to practice, or withdraws from the firm, the agreement requires that his or her stock shall be sold back to the firm at the formula price.

---

[2]Husband's stock purchase agreement states in pertinent part:

"2. *Purchase.* If the shareholder's employment with the corporation is terminated for any reason, including death or permanent disability, or if the shareholder ceases to be an eligible shareholder or becomes a disqualified person . . . , the corporation shall purchase his shares and the shareholder or his personal representative or other successor in interest shall sell them to the corporation according to the terms of this agreement.

"3. *Purchase price.* The purchase price of the shareholders' [sic] shares shall be equal to their book value at the beginning of the calendar month within which his employment is terminated; provided, however, that no income attributable to services rendered by the corporation after the shareholder becomes a disqualified person shall be considered in

Husband signed the stock purchase agreement when he became a shareholder. Community property assets were used to pay $4,800 for the purchase of husband's interest.

Each of McDonough's shareholders owns essentially the same number of shares (approximately a 2.677 percent interest), and each has an equal voice in firm management. Shareholder compensation does not depend on the number of shares held. Rather, an employment contract provides that each shareholder draws a salary based on "units" of seniority, multiplied by an amount of annual salary per unit. Upon becoming a shareholder, an employee is given a minimum of 12 units of seniority and a unit is added each year thereafter, up to a maximum of 24 units. No evidence was introduced demonstrating that the amount of annual salary per unit fluctuates each year based upon the firm's income. Instead, the amount of annual salary per unit is a set figure that does not change until a sufficient number of shareholders lobby for an increase. Compensation also includes a bonus which is calculated pursuant to a formula based on billable hours and dollars brought in. A bonus is given to all of the firm's attorneys, not just shareholders. A committee awards up to 10 shareholders an additional bonus for "subjective factors," such as "rainmaking [the ability to bring in work]."

McDonough has separate pension and profit-sharing plans which are funded exclusively by the firm. McDonough contributes approximately 20 percent of salary to the programs which are fully vested from the commencement of employment or shareholder status. The firm also has a medical reimbursement plan, as well as medical, dental, life, disability and vision insurance.

The firm's finances are structured so that shareholders do not build wealth through the value of their stock, but through the pension and profit-sharing plans and through other vehicles such as an equipment leasing partnership in which a shareholder may choose to participate. McDonough's policy is that the cost to a shareholder to buy into the firm, or the cost to the firm to buy out a shareholder, should be kept relatively low; the actual figures have ranged between approximately $5,000 and $20,000. A low buy-in price benefits the firm by making it easy to attract good attorneys; a low buy-out price benefits the firm by minimizing the burden on shareholders when attorneys die, become unable to practice, or leave.

---

determining the value of his shares. In determining the book value of his shares no allowance shall be made for accounts receivable, accounts payable or goodwill."

The agreement does not expressly refer to work in progress; however, because the corporation maintains its books on a cash rather than an accrual basis, neither accounts receivable nor work in progress appears on the corporation's books and neither is included in the corporation's book value.

The book value of the shares is the shares' percentage of the book value of the corporation.

Cecelia Delury, a certified public accountant called to testify by wife, valued husband's interest in the McDonough firm at $142,000. Because the firm maintains its books on a cash basis (which does not consider accounts receivable or work in progress), Delury added those items to the firm's stated assets as shown on its balance sheet. Delury estimated that the largest portion of the firm's accounts receivable—those more than 90 days old—were 50 percent collectable. The firm had informed Delury that those accounts were only 10 percent collectable; however, in light of her experience with other professional firms, Delury concluded the 10 percent figure was not reasonable. After calculating the firm's book value, including receivables and work in progress, Delury multiplied this figure by husband's 2.677 percent shareholder interest to determine the community's interest in the firm. Delury considered the fact that husband's interest in his firm was "a very small percentage," but determined this fact was "not relevant" and that a minority discount should not apply because husband was not leaving the firm. She similarly declined to apply a "marketability discount" based upon the stock purchase agreement's "substantial restriction as to price and . . . ability to sell the interest in the law firm" because she assumed husband would continue as a partner in the firm. Delury conceded she would apply a minority discount if she was valuing a person's small percentage ownership in a firm, there was no existing buy-sell agreement, and she was helping the people remaining in the firm to negotiate a buyout.

David Schultze, a certified public accountant called by husband, testified that husband's interest in his firm should be valued according to the stock purchase agreement. He stated that shareholders ordinarily have an interest in their corporation's accounts receivable and other assets, but that a shareholder's interest may be limited by the terms of a stock purchase agreement. Pursuant to the stock purchase agreement in the present case, husband has no compensable interest in the firm's accounts receivable or work in progress because he did not acquire such an interest when he joined the firm and would not receive remuneration for these assets if he left McDonough. The firm, which had existed for 36 years, has adhered to the stock purchase agreement for the 17 years it has existed as a corporation and does not plan to change the agreement. Furthermore, husband has no control over the terms of the agreement. Unless the firm were to change the agreement or decide to liquidate (both of which are unlikely), husband never will receive more for his interest in the firm than the stock purchase agreement allows. Schultze also testified that, as of the date of valuation, the liquidation value of husband's shareholder interest in the firm probably was zero due to the amount of long-term debt owed by the firm which would have to be paid or resolved in some manner upon liquidation. Even after making assumptions in the light most favorable to wife concerning various liquidation factors,

including the firm's ability to buy out or sublet its long-term office lease, Schultze calculated that the maximum amount husband would receive as a shareholder if the firm liquidated was approximately $16,500.

Schultze noted that, unlike other firms, McDonough does not just pay out its profits to its shareholders. Instead, shareholders' bonuses are based upon their own productivity, not upon their shareholder percentage of the firm's earnings; and nonshareholder associates also receive such bonuses. All of the employees, not just shareholders, receive an annual pension plan contribution equivalent to 20 percent of their salary. The firm's philosophy is that, if it is generous to its employees and transfers its earnings to all of them, it will attract the most qualified employees, which in turn will enrich the firm. Becoming a partner or shareholder simply conveys a voice or modicum of control in the management of the firm and an interest in the firm's assets, but that interest is restricted by the stock purchase agreement, which excludes accounts receivable and work in progress.

Applying the shareholder agreement, Schultze valued husband's interest in the McDonough law firm at $11,347.

Schultze also calculated what husband's shareholder interest would be absent the stock purchase agreement, in case the trial court found the stock purchase agreement was not the proper valuation method. He used basically the same method used by Delury but disputed her opinion that the firm's receivables more than 90 days old were 50 percent collectable; Schultze agreed with the firm's estimate of 10 percent collectability. Many of these receivables were several years old but could not be purged easily from the firm's computer records due to certain limitations in the computer's software. Schultze testified that husband's shareholder interest should be subject to a combined minority and marketability discount of 80 to 90 percent. Thus, even if accounts receivable and work in progress are included among the firm's assets, the minority discount would reduce the value of husband's shareholder interest to approximately $12,500 to $25,000.

In deciding to value husband's shareholder interest in the McDonough law firm in accordance with its stock purchase agreement (with the exception of goodwill), the trial court explained: "[Husband's] law firm, McDonough, Holland & Allen has been in existence for 36 years. In 1974, the firm incorporated. Since its incorporation, all shareholders in the firm are required to sign, as a condition of becoming a shareholder, the stock purchase agreement. [Husband] joined the firm as a shareholder in 1978 and signed the stock purchase agreement as a condition of becoming a shareholder. The stock purchase agreement has not changed in any material way since 1974.

[Husband] has no control of the terms of the stock purchase agreement and no evidence was presented that any material change in the stock purchase agreement is contemplated. The purpose of the stock purchase agreement is to permit easy access and egress from the firm and to prevent splits in the firm which would have major economic impacts on the continued viability of the firm. There has never been a major split at McDonough, Holland & Allen. Furthermore, in the case of every shareholder who has retired or left the firm, including two named shareholders, the stock purchase agreement was followed. Those shareholders received only those amounts then due under the terms of the stock purchase agreement. [¶] There was no evidence introduced that the stock purchase agreement's purpose was to deprive spouses of any rights and no evidence of any collusive intent or purpose of the stock purchase agreement was introduced. [¶] The Court additionally finds that the firm has a generous pension and profit sharing plan and gives large yearly bonuses as a supplement to salaries. There was no evidence that the firm has contemplated either a liquidation or that [husband] is contemplating leaving the firm. [¶] In light of these factors, the Court finds that the stock purchase agreement should control, with respect to valuing [husband's] shareholder's interests in the law firm of McDonough, Holland & Allen. [¶] Based on the evidence presented, the Court finds that pursuant to the stock purchase agreement, [husband's] interest in the firm as of December 31, 1990, (the date stipulated to by [the parties]), was $11,347. The Court, therefore, adopts that value as the community property interest in the law firm. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738 [131 Cal.Rptr. 873, 552 P.2d 1169]; *In re Marriage of Rosan* (1972) 24 Cal.App.3d 885 [101 Cal.Rptr. 295].)"

On the issue of goodwill, the trial court held that "a spouse's interest in goodwill . . . is not determined by a stock purchase agreement. (*In re Marriage of Fenton* (1982) 134 Cal.App.3d 451 [184 Cal.Rptr. 597]; *In re Marriage of Slater* (1979) 100 Cal.App.3d 241 [160 Cal.Rptr. 686]; *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93 [113 Cal.Rptr. 58] [disapproved on other grounds in *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453 [143 Cal.Rptr. 139, 573 P.2d 41]].)" In light of husband's status as a senior member of the largest and one of the oldest law firms in Sacramento, the court found that he had professional goodwill, and valued the community interest therein at the stipulated amount of $35,000.

The parties stipulated that wife has a community property share of husband's pension plan in the sum of $21,690 and a community property interest in his profit sharing plan in the sum of $83,350. They agreed that husband would have that total amount "rolled over into a tax deferred account in [wife's] name at a financial institution designated by [her]."

In addition, the trial court awarded wife permanent spousal support of $2,350 per month and attorney fees and costs of $19,640.

## DISCUSSION

Wife appeals "as to only one issue of the Judgment of Dissolution and that is the value of the community interest in the law firm of which [husband] is a shareholder." She contends the trial court erred in valuing husband's shareholder interest in accordance with the stock purchase agreement because the agreement does not include the value of accounts receivable and work in progress. Wife believes the judgment must be reversed because the trial court "failed to consider all required factors in valuing [husband's] interest in the law firm." Under the facts of this case, we disagree.

The trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented. (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88 [16 Cal.Rptr.2d 575].) The valuation of a particular asset is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record. (*In re Marriage of Micalizio* (1988) 199 Cal.App.3d 662, 673 [245 Cal.Rptr. 673].) All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment. (*In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 162-163 [228 Cal.Rptr. 76].) The trial court's judgment is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)

"In determining the value of a law practice or interest therein, the trial court should determine the existence and value of the following: (a) fixed assets, which we deem to include cash, furniture, equipment, supplies and law library; (b) other assets, including properly aged accounts receivable, costs advanced with due regard for their collectability; work in progress partially completed but not billed as a receivable, and work completed but not billed; (c) goodwill of the practitioner in his law business as a going concern; and (d) liabilities of the practitioner related to his business." (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 110 [113 Cal.Rptr. 58]; accord, *In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1522 [284 Cal.Rptr. 201]; *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 688-689 [226 Cal.Rptr. 485].)

Of the various aforementioned factors, accounts receivable, work in progress, and work completed but not yet billed are very significant to

proper valuation because they usually represent the law firm's major assets. "The courts have recognized that '[a]t any given moment the major assets of most law firms are not capital assets, but those related to the direct rendering of professional services, most particularly accounts receivable and work in process.' " (*In re Marriage of Kilbourne, supra,* 232 Cal.App.3d at p. 1522, quoting *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 21 [261 Cal.Rptr. 294].)

 Accordingly, the trial court in this case had to assess whether the accounts receivable and work in progress of husband's law firm had value to the community, i.e., whether husband's shareholder interest included a valuable interest in these assets.

After hearing conflicting testimony concerning whether husband's shareholder interest included a valuable interest in the firm's accounts receivable and work in progress, the trial court determined the stock purchase agreement—which excludes the value of these assets—is an appropriate valuation method. Implicit in this determination is a finding that the community does not have an interest of any value in the firm's receivables and work in progress. We may imply such a finding in support of the judgment because wife did not object to the trial court's statement of decision and point out any perceived deficiencies or ambiguities concerning whether the court found the firm's receivables and work in progress are of any value to husband as a shareholder. (*In re Marriage of Arceneaux, supra,* 51 Cal.3d at pp. 1133-1134; *In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 570 [5 Cal.Rptr.2d 558].) Our review discloses that substantial evidence supports the trial court's judgment.

Schultze testified that husband's shareholder interest in the firm's assets is limited by the stock purchase agreement. Husband did not pay for an interest in the firm's receivables or work in progress and will not receive compensation for such assets upon his withdrawal from the firm. Unlike the typical scenario wherein a shareholder or person with an ownership interest in a business receives a pro rata share of the firm's profits as dividends or compensation, husband does not share in the firm's earnings by virtue of being a shareholder. Instead, in accordance with his employment agreement, he is compensated as an employee based upon his own productivity and length of service to the firm rather than his percentage shareholder interest. Thus, the trial court reasonably could conclude that at the time of valuation husband did not have a 2.677 percent shareholder interest in the firm's receivables and work in progress as calculated by Delury; barring the unlikely event of a change in the shareholder agreement, husband would have such an interest only upon the liquidation of the firm—an equally

unlikely occurrence. Furthermore, Schultze opined that, even if the firm liquidated, husband's shareholder interest after the firm's debts were paid would be worth approximately $16,500 at most, but that it was more probable his interest would be worth nothing or he would owe money to the firm. In light of this evidence, the trial court did not abuse its discretion in using the stock purchase agreement, which excludes accounts receivables and work in progress, to value the community interest in husband's law firm.

Wife argues the court erred in using the stock purchase agreement to value husband's shareholder interest because the agreement merely measures a shareholder's contractual withdrawal rights and it was undisputed that husband was not withdrawing from McDonough. We disagree. Even though it was not valuing husband's contractual withdrawal rights, the trial court was not precluded from using the stock purchase agreement—which is an arm's-length buy-out agreement—to determine the community interest in the business. ■ In assessing whether to use a formula set forth in a buy-sell agreement, the trial court should consider (1) the proximity of the date of the agreement to the date of separation to ensure that the agreement was not entered into in contemplation of marital dissolution; (2) the existence of an independent motive for entering into the buy-sell agreement, such as a desire to protect all partners against the effect of a partnership dissolution; and (3) whether the value resulting from the agreement's purchase price formula is similar to the value produced by other approaches. (1 Cal. Marital Dissolution Practice (Cont.Ed.Bar 1981) Special Problems of Property Division, § 9.77, p. 320.) ■ Here, the trial court found that the firm had an independent motive for entering into the buy-sell agreement and that there was no evidence the stock purchase agreement—which husband signed approximately eight years before the parties separated—was designed to deprive shareholders' spouses of any rights. As to the third factor, Schultze calculated that, even if the firm's accounts receivable and work in progress were included in valuing husband's shareholder interest, after applying appropriate marketability and minority discounts, husband's interest was worth only $12,500 to $25,000. This amount is not substantially greater than the valuation based upon the stock purchase agreement.[3] Therefore, these factors further support the trial court's use of the stock purchase agreement

---

[3]In her reply brief, wife suggests that a minority and marketability discount should not be applied in valuing husband's shareholder interest because, according to her expert, these discounts are not applied to professional corporations. We need not consider this belated contention for two reasons. First, without good cause, it was not raised until the reply brief. (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Second, the contention is based solely upon the opinion of wife's expert—which was disputed by husband's expert at trial—and is advanced on appeal without any legal analysis or citation to supporting authority. (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72] [when a point is asserted without any argument of or authority for the

to value husband's shareholder interest in the firm. (1 Cal. Marital Dissolution Practice, *op. cit. supra*, § 9.77, p. 321.)[4]

In light of our conclusion that the trial court did not abuse its discretion by valuing husband's shareholder interest using the formulation in his stock purchase agreement, which excluded the value of accounts receivable and work in progress, husband's protective cross-appeal is rendered moot.

## DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Nicholson, J., concurred.

---

proposition, "it is deemed to be without foundation and requires no discussion by the reviewing court"].) Having declined to consider the question for the reasons stated above, we express no opinion on whether a minority and marketability discount should or should not be applied in valuing a shareholder interest in a professional corporation such as husband's law firm.

[4]As husband correctly points out, "[t]here is no inconsistency between the trial court's decision to disregard the stock purchase agreement [and] recognize a community property interest in [husband's] goodwill, while following the provisions of the agreement that exclude receivables from the assets in which shareholders have an interest." Goodwill reflects the extent to which husband's earning power is greater than that of his peers. It is a community asset because husband's experience, reputation and skill, which enable him to command this high income, were developed while he was married to wife. "It indirectly creates excess income for husband whether he stays with his firm or strikes out on his own." (*Marriage of Fenton, supra*, 134 Cal.App.3d at p. 463.) In other words, husband has personal goodwill regardless of whether he remains with the firm, and this goodwill cannot be eliminated by a recital in the stock purchase agreement. (*Ibid.*)